# UNITED STATES DISTRICT COURT
## for the SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **FRANKLIN UNITED METHODIST HOME, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| *vs.* | ) | **CAUSE NO. 1:10-cv-1086-RLY-DKL** |
| | ) | |
| **LANCASTER POLLARD & CO.,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## ENTRY and ORDERS

### Plaintiff's *Motion for Protective Order* [doc. 86]
### Defendants' *Motion to Compel* [doc. 94]

This Cause comes before the Court on the above-entitled motions. Plaintiff Franklin United Methodist Home ("FUMH") seeks a protective order **(1)** facilitating its production of non-privileged documents that relate to its settlement agreement with non-party Lehman Brothers Special Financing, Inc. ("Lehman") and that are currently subject to confidentiality orders issued in Lehman's bankruptcy case, and **(2)** precluding its production of privileged attorney-client and work-product documents pertaining to that settlement. Defendants Lancaster Pollard & Co. and Steven W. Kennedy, one of its partners (collectively "LP") seek an order compelling FUMH to produce both categories of documents. For the reasons set forth herein, FUMH's motion is granted and LP's motion

1

is denied.[1]

Familiarity with the details of the allegations is presumed and are summarized here as relevant to the present motions.   In its role as FUMH's financial advisor, LP recommended to FUMH that it enter into two interest-rate swaps with Lehman.  FUMH accepted the recommendation and entered into two such swaps, one in 2006 and one in 2007.  In September 2008, Lehman filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York, Judge James M. Peck.  *In re Lehman Brothers Holdings, Inc., et al.*, Chapter 11 Case No. 08-13555 (JMP) (Bankr. S.D. N.Y.) ("*Lehman Bankruptcy*").  In October and November 2008, LP advised FUMH that Lehman's filing constituted defaults under the terms of the swaps, entitling FUMH to terminate the swaps, and that FUMH should not make the next payments.  LP prepared notices of the suspension of FUMH's payments and the termination of the swaps and directed FUMH to fax the notices to Lehman.  FUMH followed LP's advice and utilized their notices.  In addition, FUMH alleges that, in November 2008, again at the direction and advice of LP, FUMH entered into a swap transaction with Morgan Stanley Capital Services, Inc. to replace the Lehman swaps.

FUMH alleges that LP's notices and directions regarding the Lehman swaps were defective in three respects:  first, the notices terminated only the 2007 swap, not the 2006

---

[1] Peck, Shaffer & Williams, LLP, and Jason L. George participated in the briefing on FUMH's motion for protective order while third-party defendants.  They since have been dismissed but added as defendants.

swap as well; second, under the terms of the swaps, termination notices could not be sent by fax; and, third, LP miscalculated the termination payment due from FUMH to Lehman.

In September 2009, Lehman notified FUMH that its purported termination of the swaps was not valid, that FUMH was delinquent in its payment obligations under the swaps, and that its delinquency was a violation of the automatic bankruptcy stay (the "Lehman Claims").  [Doc. 87-1.]  Lehman asserted that FUMH was, therefore, obligated to continue making its payments and that it was then too late for FUMH to terminate the swaps based on Lehman's insolvency, financial condition, or bankruptcy.  Lehman also indicated that the Bankruptcy Court had the power to enforce FUMH's performance under the swaps.  Lehman included with its letter a September 15, 2009 ruling issued by the Bankruptcy Court in its case regarding another customer's swap contract with Lehman that supported Lehman's positions (the "*Metavante Order*").  [Doc. 87-3].  Lehman demanded that FUMH resume its payments and pay all arrearages, with interest.  Lehman also warned that it might seek compensation for all damages it incurs as a result of the delinquencies.[2]

FUMH filed the present suit against LP in August 2010, seeking a declaratory judgment that, if FUMH is found liable on the Lehman Claims, then LP is liable to FUMH for all resulting damages and the costs and fees incurred by FUMH in defending the

---

[2] FUMH was listed as a derivatives-contract counterparty in Lehman's initial and amended Schedules G (Executory Contracts and Unexpired Leases, Rider G – Derivatives Contracts) filed in March and June 2009.  *Lehman Bankruptcy* [docs. 3021 and 3066].

Lehman Claims.  [Doc. 1-1, p. 4.]

The Bankruptcy Court aggressively promoted quick settlements with Lehman's swap customers in hopes of bringing substantial assets into Lehman's bankruptcy estate without trial or further litigation.  To that end, the court ordered the customers and Lehman to engage in alternative dispute resolution ("ADR") and ordered certain procedures to facilitate those efforts.  *In re Lehman Bros., Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts* (doc. 5207) ("*ADR Order*") (Bankr. S.D. N.Y., Sept. 17, 2009) [doc. 87-2 in the present case].  Under the *ADR Order*, FUMH was compelled to engage in good faith in the mandatory staged ADR process with Lehman.  This process consisted of an initial notice/response stage, followed, if resolution is not achieved, by a mediation stage with a third-party mediator.  The *ADR Order* also warned the parties of the possible consequences of failing to participate in good faith:

> 12. <u>Sanctions for Parties</u>.  Each Debtor, Derivatives Counterparty and Indenture Trustee must participate in good faith with these Derivatives ADR Procedures with regard to the ADR Disputes specified in the applicable Derivatives ADR Notice.  If, after notice and a hearing, the Court determines that a party has not complied with the Derivatives ADR Procedures in good faith in connection with any Derivatives ADR Dispute, the Debtors, Derivatives Counterparty or Indenture Trustee, as the case may be, may be subject to such sanctions as the Court deems appropriate (the "Sanctions").  If a mediator reports to the Court that any party subject to this Order is not cooperating in good faith with the Derivatives ADR Procedures, the Court may, without the need for further motion by any party, schedule a hearing and order Sanctions.  Litigation with respect to the issuance of Sanctions shall not delay the commencement of the Mediation Stage of these procedures upon completion of the Notice/Response Stage.  Sanctions may include, but

are not limited to:

        *     *     *

   b.  <u>Against Derivatives Counterparties (including Indenture Trustees with Authority)</u>: (i) attorneys' fees incurred by the Debtors with respect to the Derivatives ADR Procedures after the sending of an ADR Package; (ii) fees and costs of the Mediator; (iii) an award of the Derivatives ADR Dispute up to the amount specified in the Derivatives ADR Notice.

*ADR Order* § 12.

In the *Metavante Order*, Judge Peck found that Metavante, another swap customer of Lehman, had waived its contractual option to terminate the swap by not taking timely and effective action "fairly contemporaneously" with Lehman's bankruptcy filing and, therefore, continued to owe payments to Lehman. Because he found that Metavante had "an insufficient commitment to a timely settlement" after unsuccessfully engaging in ADR, Judge Peck ordered it to perform under the swap agreement until such time as Lehman determined, under the Bankruptcy Code, whether to assume or reject their executory swap contract. Thus, Metavante was held responsible for making delinquent payments in excess of six million dollars (representing unpaid quarterly payments and in excess of $300,000 default interest) and future swap payments.

Lehman initiated the notice/response stage of the ADR process with FUMH in May 2011. FUMH and Lehman reached a settlement sometime in September 2011, (*Defendants' Combined Memorandum in Opposition to Plaintiff's Motion for a Protective Order* [doc. 95] ("*Defendants' Combined Memorandum*") at 11 n. 2), pursuant to which FUMH made payment

of $2.4 million to Lehman.  *Amended Complaint* [doc. 44] ¶ 17.

In December 2012, FUMH filed its *Amended Complaint*, asserting negligence and breach-of-fiduciary-duty claims against LP.  [Doc. 44.]  FUMH alleges that the assertion of the Lehman Claims and its resulting settlement of them were the proximate results of LP's faulty advice and services.  It seeks judgment against LP for its damages, including, but not limited to, FUMH's settlement payment to Lehman, the costs of the Morgan swap, fees and costs incurred defending the Lehman Claims, and disgorgement of all fees and moneys paid to LP for its services.  LP brought third-party claims against the law firm Peck, Shaffer & Williams, LLP, and Jason L. George, one of its partners, (collectively "Peck"), who provided legal advice to LP regarding the termination of the Lehman swaps.  LP's claims demanded reimbursement for any amounts for which LP is held liable to FUMH.  In September 2012, the Court dismissed LP's third-party claims against Peck as untimely. [Doc. 123.]  In October 2012, FUMH filed its *Second Amended Complaint* adding Peck as defendants and asserting legal-malpractice and breach-of-fiduciary-duty claims against them.  [Doc. 138.]

LP served thirty requests for production on FUMH seeking documents relating to FUMH's settlement negotiations and agreement with Lehman.  [Doc. 87-5.]  For example, the requests seek the following categories of documents:

> 4.  All notes, memoranda, and all other documents which, directly or indirectly, relate to, refer to, and/or comment upon any and all meetings, conferences, and/or mediations between FUMH and Lehman . . . .

6

6.   All documents which, directly or indirectly, relate to, refer to, and/or comment upon the "*settlement payment made to Lehman Brothers Special Financing in the amount of $2,400,000*" . . . including, but not limited to, all settlement agreements, all drafts of or proposed settlement agreements . . . and all drafts of or proposed releases and covenants not to sue.

7.   All notes, memoranda, and all other documents prepared, in whole or in part, by any member of FUMH's Board of Trustees or any officer, employee, or attorney for FUMH . . . pertaining, directly or indirectly, to any settlement or proposed settlement with Lehman of the Lehman Claims.

8.   All documents which, directly or indirectly, contain any assessment and/or evaluations of the merits of the Lehman Claims.

9.    All documents which, directly or indirectly, contain any recommendations or advice to FUMH to settle the Lehman Claims.

13.   All documents which, directly or indirectly, explain why FUMH paid Lehman the sum of $2,400,000 to settle the Lehman Claims . . . .

28.   All documents which, directly or indirectly, contain, set forth, relate to, refer to, or comment upon any and all opinions or conclusions that FUMH was at any time liable to Lehman for the Lehman Claims.

29.   All documents . . . which mention, relate to, refer to, and/or comment upon Lehman, the Lehman Claims, LP, Peck, and/or Benesch.

30.   All documents which, directly or indirectly, relate to, refer to, and/or comment upon any and all discussions, negotiations, and/or mediations between FUMH and Lehman with respect to the settlement or compromise of the Lehman Claims.

Peck served similar requests for production.  [Docs. 87-6 and 87-7.]  FUMH objected to producing two categories of documents — privileged documents covered by the attorney-client and/or work-product privileges, and documents relating to the Lehman Bankruptcy ADR negotiations that fall under the Bankruptcy Court's confidentiality orders.  FUMH produced a privilege log of its withheld documents.  [Docs. 94-2 through 94-10.]  After the

parties were unable to resolve their differences, FUMH filed the present motion for protective order and LP countered with the present motion to compel.  Peck participated in the briefing of FUMH's motion.

Although there is a dispute about the relevance of the requested documents to FUMH's claims, the Court finds that the dispute is irrelevant and will assume the documents' relevance for the purposes of the present motions.  The parties do not dispute the applicability of a particular privilege or restriction to any specific document; instead, they argue the general validity and effect of the privileges and the Bankruptcy Court's confidentiality orders in the facts and circumstances of this case.

### The Bankruptcy Court's Confidentiality Orders

The *ADR Order* issued in the Lehman's Bankruptcy provides that "the contents of any papers submitted during the mediation stage . . . and all discussions in mediation shall remain confidential and privileged and shall not be discoverable or admissible as evidence in any subsequent litigation of the Derivatives ADR Dispute or elsewhere, except as provided by further order of this Court."  *ADR Order* ¶ 4.  This order further provides:

> The confidentiality provisions of section 5.0 of the Standing Order are hereby incorporated by reference into this Order.  No statements or arguments made or positions taken by the mediator, the applicable Debtors, Derivatives Counterparties, Indenture Trustee or the Creditors' Committee during any part of the alternative dispute resolution process, including Settlement Conferences and the Mediation Stage may be disclosed by the mediator or any such parties or their attorneys and advisors to the Court or any third party; *provided, however*, that Indenture Trustees may disclose such statements, arguments and positions as may become necessary with their

8

respective noteholders and advisors subject to these same confidentiality provisions. Similarly, all briefs, records, reports, and other documents received or made by the mediator while serving is such capacity shall remain confidential and not be provided to the Court, unless they would be otherwise admissible. In addition, the mediator shall not be compelled to disclose such records, reports, and other documents in connection with any hearing held by the Court; provided, however, the mediator shall on a monthly basis beginning 60 days following entry of this Order report to the Court the status of the mediation efforts but shall not disclose the content thereof, which report shall include the number of ADR Notices served on Derivatives Counterparties, the number of settlements reached after mediation, the number of mediations still pending, the number of mediations that have terminated without settlement, and the cumulative dollar amount of settlements reached with Derivatives Counterparties following service of ADR Notices. Rule 408 of the Federal Rules of Evidence shall apply to all aspects of the Derivatives ADR Procedures including Settlement Conferences and Mediation Stage.

*ADR Order* § 13. The "Standing Order" incorporated by the *ADR Order*, § 1, provides:

Any statements made by the mediator, by the parties or by others during the mediation process shall not be divulged by any of the participants in the mediation (or their agents) or by the mediator to the court or to any third parties. All records, reports, or other documents received or made by the mediator while serving in such capacity shall be confidential and shall not be provided to the court, unless they would be otherwise admissible. The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in connection with any arbitral, judicial or other proceeding, including any hearing held by the court in connection with the referred matter.

*In re Court Annexed Mediation Program: Adoption of Procedures Governing Mediation of Matters in Bankruptcy Cases and Adversary Proceedings, Amended General Order M-143* § 5.1 (Bankr. S.D. N.Y., Jan. 17, 1995) ("*Amend'd Gen'l Order*"). LP does not dispute that these orders apply to the non-privileged documents for which FUMH is seeking protection.[3]

---

[3] Defendants argued that the Bankruptcy Court's orders prohibit only voluntary disclosures of ADR information, not disclosures pursuant to discovery requirements in other cases. The Court does not

FUMH wants to produce its non-privileged ADR-related documents that fall within the scope of the Bankruptcy Court's orders but it wants this Court to enter a protective order that will facilitate that production.  Lehman has agreed to FUMH's production but it wants use of the documents restricted to this case and it wants an opportunity to argue that any ADR document that a party files or uses in Court be sealed.  The parties and Lehman attempted to agree on the terms of a protective order but LP and Peck would not agree to Lehman's two conditions.  Lehman agreed to the last draft attached to FUMH's motion, specifically the following pertinent terms:[4]

> Materials designated by Plaintiff as "ADR CONFIDENTIAL" shall be used by the parties solely for the purposes of the prosecution or defense of any claim asserted in this action (the "Litigation").

*Draft Agreed Order* ¶ 5 [doc. 87-4, p. 15].

> The Materials designated "ADR CONFIDENTIAL" shall not be filed with the Court unless:  (a) the consent of Plaintiff and Lehman has been obtained; or (b) if such consent is not obtained, the party intending to file the "ADR CONFIDENTIAL" Materials gives Plaintiff and Lehman no less than 14 days notice of the intent to file the Materials (describing the Materials), to give Plaintiff or Lehman the opportunity to file a motion to have the Materials filed under seal.

*Id.* ¶ 12 [p. 18].

> If any party receives a subpoena seeking, or court order requiring, the production   or   disclosure   of   materials   designated   as   "ADR

---

interpret the Bankruptcy Court's orders to have this limited scope.

[4] (*Brief in Support of Franklin United Methodist Home's Motion for Protective Order* [doc. 87] at 9 ("Counsel for Lehman has authorized counsel for FUMH to represent to the Court that Lehman agrees to the provisions in the draft Agreed Order attached to Mr. Rosiello's April 13, 2012, email (Exhibit 4, attached to this brief).")).  The draft also specifically states in its preamble that it has the agreement of Lehman.  *Agreed Order* (draft), preamble [doc. 87-4, p. 14].

CONFIDENTIAL," the party in receipt of the subpoena or court order shall give written notice to Plaintiff within five (5) business days of receipt of such subpoena or court order, and in no event less than five (5) business days prior to the time for production of such materials pursuant to the subpoena or court order, if possible.  If such written notice cannot be made, the party in receipt of the subpoena or court order immediately must give notice to counsel for Plaintiff by telephone.  Immediately upon receipt of such notice, Plaintiff shall notify counsel for Lehman.  In no event shall production or disclosure be made before notice is given, unless the party receiving the subpoena or court order is prohibited by law or regulatory order from providing such notice.  The purpose of this Paragraph is to provide Plaintiff or Lehman the opportunity to intervene at its own expense to object to the production of the materials designated as "ADR CONFIDENTIAL".

*Id.* ¶ 14 [pp. 18-19].  The *Draft Agreed Order* also states that FUMH will not use the Bankruptcy Court's orders or the swap termination agreement as a basis to object to production and that Lehman will not seek sanctions or any other relief against FUMH for violation of the Bankruptcy Court's orders or the swap termination agreement by reason of its producing ADR documents to Defendants.  *Id.* ¶¶ 1 and 2 [p. 14].  Lehman also agreed to the following provision:  "Lehman does not believe that relief from the United States Bankruptcy Court for the Southern District of New York . . . is required for the production of "ADR CONFIDENTIAL" documents under this Order and that the ADR Order does not preclude the relief provided by this Order."  *Id.* ¶ 18 [p. 20].  The *Draft Agreed Order* provides that "Lehman shall be able to enforce this Order and is bound by the terms of Paragraph 2 of this Order."  *Id.* ¶ 19 [p. 20].

LP and Peck oppose the Court entering the *Draft Agreed Order*.  First, they argue that this Court does not have authority to abrogate or permit violation of the Bankruptcy

Court's ADR confidentiality orders; only the Bankruptcy Court can modify its own orders. Second, they argue that it is FUMH's burden to seek such modification in the Bankruptcy Court and that it cannot present the Bankruptcy Court's orders as preventing production until it has sought — unsuccessfully — such modification. LP argues that the Court should grant its counter motion for an order compelling FUMH to produce the non-privileged ADR-related documents because their relevance to this case is assumed for present purposes. FUMH then must seek modification of the confidentiality orders from the Bankruptcy Court in order to comply with this Court's order. But LP goes further: it argues that the viability of FUMH's claims in this case depend on its success in obtaining that modification. Because FUMH was not obligated to participate in the Bankruptcy Court's ADR process or to settle the Lehman Claims, LP argues that it "voluntarily," "knowingly," "purposefully," and "willfully" placed the relevant ADR-related documents within the scope of the Bankruptcy Court's restrictions while, at the same time, "harboring and preparing a claim against LP." (*Defendants' Combined Memorandum* [doc. 95] at 11-13). Therefore, FUMH "must now remove them [the ADR documents from the scope of the Bankruptcy Court's orders] if it wishes to pursue this action." (*Id.* at 13). [Doc. 87-9, p. 5 ("If the ADR Order applies to the documents at issue . . . then FUMH knowingly and voluntarily put them within its scope. It must now remove them if it wishes to pursue this action.")] Finally, Defendants argue that good cause has not been shown for restricting use of the ADR-related documents to this case or for requiring two weeks' advance notice to Lehman before an ADR Confidential document can be filed.

12

While courts accord deference to the protective orders of other courts, there are circumstances under which modifications of other courts' restrictions are justified. *See Abel v. Mylan, Inc.*, No. 09-cv-650-CVE-PJC, 2010 WL 3910141 (N.D. Okla., Oct. 4, 2010); *Air Cargo Inc. Litigation Trust v. 12 Technologies US, Inc.*, Civil No. CCB-08-2002, 2010 WL 348492 (D. Maryland, Jan. 22, 2010); *Donovan v. Lewnowski*, 221 F.R.D. 587 (S.D. Fla. 2004); *Melea Limited v. Commissioner of Internal Revenue*, 118 T.C. 218 (T.C. 2002); *Tucker v. Ohtsu Tire & Rubber Co., Ltd.*, 191 F.R.D. 495 (D. Maryland, Feb. 18, 2000). "These principles [of federalism, comity, and courtesy], while unquestionably important, are not absolute, and courts asked to issue discovery orders in litigation pending before them also have not shied away from doing so, even when it would modify or circumvent a discovery order by another court, if under the circumstances, such a result was considered justified." *Tucker*, 191 F.R.D. at 499-500.

Looking for a practical solution to the dilemma, the court in *Tucker* identified four "rules of reason" to help determine whether modification of another court's earlier protective order is justified. First, the court should consider the nature of the protective order. Was it the result of an agreement reached by the parties and issued by the court without a hearing on the merits, or was it the result of the issuing court's resolution of the parties' disputes, reflecting the court's deliberative process and decision? "There is less need for deference and comity when the order involved is really an agreement by counsel approved, almost as a ministerial act, by the court, than an action directed by the court after

a full consideration of the merits of a fully briefed dispute." *Tucker*, 191 F.R.D. at 501.

In this case, the ADR confidentiality orders issued by the Bankruptcy Court do not fall squarely into either category. Both orders were issued unilaterally by the Bankruptcy Court: the 1995 *Amend'd Gen'l Order* is court-wide standing order that applies generally to all mediations and the 2009 *ADR Order* issued in the Lehman Bankruptcy is also a general order, applying to all mediations of derivative contracts in the case, and it was issued without any input or involvement of Lehman or its derivatives customers. The Bankruptcy Court issued the orders to encourage and facilitate settlement discussions by, in the present context, protecting what it anticipated would be the confidentiality interests of mediating parties. Thus, while the orders represent the Bankruptcy Court's consideration of what protections would facilitate mediations, it did not adjudicate any disputes presented to it by the parties. In these circumstances, together with the fact that both mediating parties sought to be served by the orders, FUMH and Lehman, do not oppose modification of the orders, this factor weighs in favor of modifying the orders.[5]

Second, "the court should consider the identity of the party from whom discovery is sought." *Id.* The focus here is on whether the subject discovery is sought from the party against whom the restrictions of the earlier order apply or from the producer of the

---

[5] Despite the mediating parties' consents to modification, the Bankruptcy Court could have a strong remaining interest in protecting the confidentiality accorded its appointed mediators. However, the Court does not understand that Defendants are seeking any documents or information generated by the mediator.

documents.  In the present case, the defendants seek both FUMH-produced and Lehman-produced documents from FUMH and the Bankruptcy Court's orders apply equally to both of these parties.  In these circumstances, and especially considering the fact that neither of the mediating parties oppose modification of the orders, this factor is neutral.

Third, "the court should consider whether the case in which the original protective order was issued is still pending, and if not, the burden and expense to the plaintiffs if they are required to file a new action in the [other] court simply to seek modification of the Order issued there."  *Id.*  In this case, while the massive Lehman bankruptcy case is still pending, the matters pertaining to FUMH were concluded with the settlement.  If this Court does not modify the orders, FUMH would be required to incur the time and expense of going to the Southern District of New York and seeking to intervene in Lehman's bankruptcy case for the sole purpose of litigating a motion to modify the orders, a motion to which both mediating parties agree and in which Defendants have suggested no independent interest the Bankruptcy Court might have denying.  This factor weighs in favor of allowing the modification.

Fourth, "the court should consider whether it is possible to incorporate terms in its own order which will further the protections ordered by the [other] court."  *Id.*  Lehman consents to modification of the Bankruptcy Court's orders on condition that two confidentiality protections are maintained:  use of the information is restricted to this case and Lehman is afforded an opportunity to move to seal any of the documents that are filed

in court. The *Draft Agreed Order* includes these restrictions and they are not infrequent ones in protective orders. Defendants argue that good cause has not been shown for the Court to so limit their use of the information. The Court disagrees. Deference to the Bankruptcy Court's confidentiality orders itself provides good cause and, while there is no recognized settlement-negotiations privilege *per se*, there is a policy interest in facilitating and encouraging settlements, an interest which is well-served by preserving the confidentiality of parties' communications during the mediation process. The requested conditions do not interfere with or hinder Defendants' litigation of *this* case. If Defendants want to use the information to serve their interests in pursuing other litigation, then they may move to intervene in the Lehman Bankruptcy to move to modify the ADR confidentiality orders.

The weight of the four *Tucker* factors favors this Court's modification of the Bankruptcy Court's orders. The fact that all of the parties protected by the confidentiality orders — FUMH and Lehman — consent to their modification confirms this result. Therefore, the Court will issue the *Draft Agreed Order*, but with a modification. The *Draft* provides that, if any party intends to file ADR Confidential material in court, but FUMH and Lehman do not consent, then the filing party must "give[] Plaintiff and Lehman no less than 14 days notice of the intent to file the Materials (describing the Materials), to give Plaintiff or Lehman the opportunity to file a motion to have the Materials filed under seal." *Draft Agreed Order* ¶ 12 [doc. 87-4, p. 18]. The local rules and practice of this Court provide that a document that is intended to be filed under seal must be filed provisionally under

seal and a separate motion to maintain the seal must be filed contemporaneously.  S.D. Ind. L.R. 5-11 and *S.D. Ind. CM/ECF Policies and Procedures Manual* § 18.  Therefore, the Court prefers a protocol along the lines indicated in the margin of the *Draft Agreed Order* as having been deleted from an earlier draft.  *Draft Agreed Order* at 6 [doc. 87-4, p. 18].

Requiring fourteen days advance notice to FUMH and Lehman of an intended filing of ADR Confidential material is acceptable but should not otherwise delay the filing party's filing of the material provisionally under seal, together with a motion to maintain the seal, as indicated in the deleted terms.  The supporting brief for maintaining the seal — or a notice that the material may be unsealed — shall be filed by the party who designated the material as confidential, either FUMH or Lehman.  Therefore, if a filing party files such material under seal together with a motion to maintain the seal, then it will only be complying with the terms of the protective order issued by the Court; it will not thereby be vouching that the material is sealable; in fact, the filing party may argue against sealing the material.  The material will remain under seal until the Court rules on the motion to maintain the seal.  The preferred protocol, with a fourteen-day advance notice requirement if desired, does not materially alter the terms agreed to by Lehman.

Therefore, the parties are directed to confer, together and with Lehman, to prepare a protective order for submission that conforms to the rulings herein.  The proposed order should restore the deleted sealing protocol, with any agreed modifications, and may include a fourteen-day advance-notice requirement.

## Waiver of privileges

Defendants argue that FUMH has waived its attorney-client and work-product privileges[6] for the documents listed in its privilege log by placing the causation of its settlement with Lehman in issue and by seeking recovery of its attorney's fees incurred in defending the Lehman Claims.

**1. At-issue waiver.** Defendants argue that FUMH's professional-malpractice and breach-of-fiduciary-duty claims against them has placed the cause of its settlement with Lehman directly in-issue and, thereby, waived FUMH's attorney-client and work-product privileges regarding any materials relevant to the causes of that settlement, including communications with its attorneys regarding, *e.g.*, litigation strategy, investigation of the facts, legal evaluations, and advice, and its attorneys' work involving these matters. According to Defendants, an essential element of FUMH's claim is that Defendants' allegedly bad advice was both the cause in fact and the proximate cause of FUMH's settlement with Lehman, the truthful resolution of which will require examining FUMH's confidential communications with its attorneys and those attorneys' work product created for defending, and ultimately settling, the Lehman Claims.

The Court concludes that Defendants' interpretation of the at-issue waiver doctrine and its characterization of FUMH's causation element are incorrect.  Because FUMH is

---

[6] Although work-product protection is not a privilege, both protections from discovery will be referred to as privileges for ease of reference.

asserting an Indiana state-law claim, it is Indiana's privilege law that governs. Fed. R. Evid. 501. Defendants argue, in effect, for a blanket waiver of privileges whenever a plaintiff alleges that professional negligence caused it to incur damages. Indiana's privilege law does not go so far. Applying Indiana's law, the United States Court of Appeals for the Seventh Circuit held that an implicit waiver of privileges occurs "when a holder relies on a legal claim or defense, the truthful resolution of which will require examining confidential communications." *Lorenz v. Valley Forge Insurance Co.*, 815 F.2d 1095, 1098 (7th Cir. 1987). While Defendants rely on this general statement, more focused decisions show the scope of this "at-issue" waiver. A party waives the attorney-client privilege when it "relies specifically on advice of counsel to support a claim or a defense" and it intends to prove that claim or defense by using privileged communications. *Harper v. University of Indianapolis*, 5 F.Supp.2d 657, 664 (S.D. Ind. 1998) (collecting cases). The relevance of privileged material to a claim or defense at issue "is not a sufficient basis for finding a waiver of the privilege." *Id.* at 665. "Only when the client seeks to take advantage of the privilege communications themselves should a waiver be found on the theory that the client has put the attorney's advice in issue." *Id.* See also *Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc.*, 727 N.E.2d 240 (Ill. 2000); *Green v. Beer*, No. 06 Civ. 4156 (KMW) (JCF), 2010 WL 2653650 (S.D. N.Y., July 2, 2010), *affirmed in relevant part*, 2010 WL 3422723 (S.D. N.Y., Aug. 24, 2010); *Leviton Mfg. Co., Inc. v. Greenberg Traurig, LLP*, No. 09 Civ. 8083 (GBD) (THK), 2010 WL 4983183 (S.D. N.Y., Dec. 6, 2010), *objections overruled*, 2011 WL 2946380 (S.D. N.Y., July 14, 2011). Because FUMH has unequivocally stated that it does

not intend to use any of its logged privileged material to prove its claim against Defendants, it has not waived its privileges by putting that material in issue.

To prevail on its claim, FUMH must prove causation — both causation in fact and proximate causation. Causation in fact means that the alleged harm would not have occurred "but for" the alleged negligent conduct. *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. App. 1994). The requirement of proximate causation shortens that but-for causal chain based on foreseeability. Defendants argue that FUMH must prove that Defendants' alleged bad advice directly and immediately caused in fact FUMH to settle with Lehman, which places in issue, *inter alia*, the legal advice and information that FUMH received from its attorneys. They contend that FUMH's privilege logs show that its attorney's advice at the time was the immediate and direct cause of its settlement with Lehman, not the alleged bad termination advice given by Defendants, who repeatedly advised FUMH not to settle because their termination advice was not bad, it was not liable to Lehman, and there was no sufficient reason to settle.

The Court agrees with FUMH's description of its causation burden: Defendants' bad advice caused Lehman to assert the Lehman Claims against FUMH, the natural, foreseeable, and proximate result of which was FUMH incurring defense costs and being placed in the position of either litigating the Claims or making a reasonable settlement (and incurring the costs of either choice). To recover the cost of its settlement, FUMH must prove that its settlement was objectively reasonable considering the circumstances that it

faced. *See The Good Samaritan Home, Inc. v. Lancaster Pollard & Co.*, No. 3:11-cv-75-RLY-WGH, [doc. 72, p. 8], 2012 WL 952825, *4 (S.D. Ind., Mar. 20, 2012). Under this theory, Defendants' bad advice was a cause in fact of FUMH's settlement with Lehman in that the settlement (or the continued litigation) of the Lehman Claims would not have occurred but for the advice received from Defendants. FUMH must then prove the objective reasonableness of its settlement with Lehman.

As FUMH concedes, Defendants are free to utilize all the tools of discovery, including a Fed. R. Civ. P. 30(b)(6) deposition, to inquire into the *facts* relating to FUMH's decision to settle with Lehman, including the information that it knew at the time and information on which it relied in making that decision, including whether such information was obtained through privileged sources. However, Defendants may not discover the content of any privileged attorney-client communications or work product.

**2. Attorney's fees.** Neither FUMH's assertion of a claim for the legal fees and expenses it incurred defending the Lehman Claims nor its production of redacted invoices to support that claim waive the privileges protecting its attorney-client communications and work product. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 286 (7th Cir. 2002); *Meridian Financial Advisors, Ltd. v. Pence*, No. 1:07-cv-995-LJM-TAB, 2011 WL 1750716, *3 (S.D. Ind., May 5, 2011); *Eli Lilly & Co. v. Valeant Pharmaceuticals Internat'l*, No. 1:08-cv-1729-TWP-TAB, 2011 WL 691982 (S.D. Ind., Feb. 15, 2011); *Zion's First Nat'l Bank v. Boyz Car Wash, Inc.*, No. 1:09-cv-331-LJM-JMS, 2010 WL 779499 (S.D. Ind., Feb. 25, 2010). FUMH may

produce its redacted invoices without effecting a waiver.

## Conclusion

Plaintiff's *Motion for Protective Order* [doc. 86] is **GRANTED**.  The parties are directed to confer on the text of a proposed protective order and FUMH shall file a proposed protective order **no later than November 26, 2012**.  Defendants' *Motion to Compel* [doc. 94] is **DENIED**.

**SO ORDERED this date:** 11/08/2012

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* e-mail.